DECISION AND JUDGMENT ENTRY
This is an appeal from a decision of the Lucas County Court of Common Pleas that sentenced appellant following his conviction for one count of aggravated robbery with a firearm specification. The trial court's decision is affirmed for the reasons that follow.
On appeal, appellant raises the following assignment of error:
 "The Trial Court Abused its Discretion by Allowing the Testimony of a Surprise Witness, Depriving the Defendants
[sic] of Due Process"
The facts relevant to this appeal are as follows. On August 31, 1999, appellant, and a co-defendant, Lamar Cartlidge, were each indicted on one count of aggravated robbery, in violation of R.C. 2911.01(A)(1) with a firearm specification, in violation of R.C. 2941.145. On September 15, 1999, appellant pled not guilty and a jury trial was held on November 8 and 9, 1999.
At trial, the following relevant evidence was presented. First, the state presented the testimony of Ray Malczewski, owner of Malczewski's Market. Malczewski testified that he and his wife were working at the market on August 21, 1999 at approximately 2:30 p.m. when his grandson, Allan Gladieux, came into the store to get change for a new $50 bill. As Malczewski was in the process of getting the change, two men came into his store. One of the men was tall and the other was described as short and chubby. Both men wore dark, heavy clothes, hoods, and bandanas covering their faces. According to Malczewski's testimony, the taller man placed a gun to the side of Malczewski's head and demanded money. He also held the gun to Malczewski's wife's head. The shorter man had a bag into which Malczewski put the money from the cash register. The two men left the store with between $250 and $400 and some cigarettes. Malczewski also identified a handgun entered into evidence as State's exhibit No. 1 as either being the gun used in the robbery or as being substantially the same as the gun used in the robbery.
Gladieux was the second person to testify. He corroborated his grandfather's testimony regarding the robbery itself. He added, however, a few additional details. He described the bag held by the shorter robber as black with a zipper. Further, he testified that the handgun in evidence was the gun used in the robbery. He also described the bandanas worn by the two robbers as blue with white splotches and he identified two such bandanas, marked as exhibits Nos. 2 and 3, as the bandanas worn by the two men. Gladieux then testified that when the two men left the store, he ran after them. His uncle, Norman Malczewski, came outside to see what was going on and Gladieux asked him to watch the alley into which the two men had run. He testified that he ran down Pulaski Street toward Campbell Street and that the two men ran through the alley and then cut across some back yards, also running toward Campbell. The tall robber was ahead of Gladieux, and Gladieux was running parallel to the shorter robber. He lost the two men when they ran between houses. Based upon where they had disappeared, Gladieux concluded the robbers had to have run into the a particular house on Campbell Street. Gladieux then stayed outside of the house until after the police arrived. After the police arrived, which Gladieux testified was "within a few minutes," Gladieux told them he could identify the people he was chasing. The police then brought Cartlidge and appellant out of the house individually. They also brought out all of the other individuals that were in the house. When Cartlidge and appellant left the house, they were wearing different clothes than those wore by the robbers at the market. Gladieux immediately identified Cartlidge. Although he could not identify appellant's face, he testified that he told the police that appellant's body type was "perfect to the one that was in the store and the one that [he] was running parallel to." At trial, Gladieux stated that he was one hundred percent positive that Cartlidge and appellant were the ones that robbed the store.
During cross-examination, it was brought out that appellant had a mark on his forehead that should have been visible to Gladieux, but Gladieux did not remember such a mark.
Norman Malczewski testified to giving his nephew, Gladieux, a crisp new $50 bill for helping him fix his roof. He also testified to watching Gladieux chasing the two men and that the two men ran to the third or fourth house on Campbell Street, although he did not see them actually enter the house. He continued to watch until the police arrived and he did not see anyone come away from the house.
Josh Franks testified that the gun in evidence was operational.
Kionna Gray, an eleven year old, testified next over appellant's objection. Appellant objected to the admission of this testimony because the state had not disclosed the name of this witness until the morning of the trial. The prosecutor stated that as soon as he was given the information he gave it to the defense counsel. The prosecutor explained that he had called the defense counsel on the Friday before trial (trial began on Monday) and told them that an eleven year old girl might be testifying. He stated that he did not know of the existence of the child until that Friday and he did not receive the name and address of the child until the morning of trial. The trial court allowed Gray to testify.
Gray testified that while she was sitting on her back porch with some other children, she witnessed two men run out of the market. One of the men was holding a black duffle bag. She identified this man as appellant, whom she had seen in her neighborhood a number of times. She could not identify the other man, whom she described as tall. She testified that both men were wearing blue scarves over their faces. She further testified that appellant, whom she referred to as "Jamal," stopped at a garage, ran through the alley, and into his house.
Detective Jesse Villarreal, with the Toledo Police Department, testified next. Detective Villarreal testified that on the night of August 21, 1999, he was called to 1454 Campbell Street. According to his testimony, uniformed officers had arrived at the house before his arrival and secured the house. There were a total of eight African-American males in the house at that time, including Cartlidge and appellant. The police told Villarreal they had found Cartlidge and appellant hiding in the basement behind a water heater. The men were dressed differently than the robbers. Upon patting down the two men, they found $86.78 on appellant. Included in the $86 was a new $50 bill. Furthermore, a black duffel bag was found in the living room with two blue and white bandanas inside, and a loaded revolver, which was identified by Gladieux as the revolver used in the robbery, was found in a closet. Villarreal testified that he had decided to remove the eight suspects from the house, one at a time. Gladieux immediately identified Cartlidge when he left the house. According to Detective Villarreal, Gladieux was not able to identify appellant's face. However, when all of the suspects were lined up outside, Gladieux stated that appellant most closely fit the size and weight of the other robber. Detective Villarreal also testified that appellant's nickname was Jamal.
Further, Detective Villarreal testified regarding the his knowledge of the identity of Gray. He testified that about ten days before trial he remembered a report that had been taken by another police officer at the time of the robbery. That report referred to some child witnesses, although not by name. He made a search for the record and finally received a copy of the record on approximately the Wednesday before trial. He then asked the sergeant who had made the report if he could find the children he had talked to in August. He did not testify as to when he received the specific information regarding Gray's name and address.
Lastly, Tamra McNeal, Cartlidge's mother, testified. She identified pictures she had taken of the area in question.
At the conclusion of the testimony, a jury found appellant and Cartlidge guilty of aggravated robbery with a firearm specification. Appellant was sentenced on November 24, 1999 to five years in prison and an additional three years, to be served consecutively, for the firearm specification. Appellant filed a timely appeal, arguing that the court erred in admitting the testimony of Gray.
The testimony of an undisclosed state's witness can be admitted if "it can be shown that the failure to provide discovery was not willful, foreknowledge of the statement would not have benefited the defendant in the preparation of the defense, and the defendant was not prejudiced by the admission of the evidence." State v. Heinish (1990), 50 Ohio St.3d 231, syllabus. In the present case, there is no argument that the state's failure to provide discovery was willful. The prosecutor stated that he gave the information to the defendants as soon as he received it. Appellant argues that foreknowledge of the information would have benefited his case because (1) appellant's attorney would have had an opportunity to question Gray and find out that there were other people on her back porch that day and to interview these other potential witnesses, (2) appellant's attorney would have had an opportunity to "test Miss Gray's opportunity to observe the alleged facts to which she testified," (3) appellant's attorney was limited in his ability to test for any bias or prejudice, and (4) the defense was denied the chance to discover the existence of any prior inconsistent statements. Further, appellant argues that the admission of Gray's testimony was prejudicial to his case.
Upon review of the evidence, this court finds that it was not an error to admit Gray's testimony. We do not believe that the defense would have benefitted from the prior knowledge of Gray's testimony, or do we believe that her testimony was prejudicial. Appellant was given a chance to cross-examine Gray on the stand as to any bias and her ability to observe the facts to which she testified. Further, even without her testimony, there was other substantial evidence of appellant's guilt. Appellant and Cartlidge were found hiding behind a water heater in the house that Gladieux testified the robbers must have entered. In that same house, police found the gun used to commit the robbery and a black duffel bag containing two blue and white bandanas which Gladieux testified were the ones worn by the robbers. Further Gladieux testified at trial that he was one hundred percent positive that appellant and Cartlidge were the robbers. Gladieux further testified that appellant's body type was "perfect to the one that was in the store and the one that he was running parallel to."
Furthermore, even if the admission of Gray's testimony was error, any such error was harmless. As discussed above, we find there to have been other substantial evidence of appellant's guilt. We believe the testimony of Gladieux as to the identification of appellant as the robber was sufficient to prove appellant's guilt beyond a reasonable doubt, without the testimony of Gray. Accordingly, we find appellant's assignment of error not well-taken.
On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Melvin L. Resnick, J. James R. Sherck, J., Richard W. Knepper, J., CONCUR.